## CHURCHILL v. GEORGIA RAILROAD & BANKING CO.

The word "marks" in section 2248 of the Civil Code, which makes it the duty of overseers or track-menders of railroads to file with the station-agents "a list of the different marks and brands of all stock killed upon their respective sections the preceding week," includes only such marks as are placed upon stock by artificial means.

Argued May 30, — Decided July 22, 1899.

Action for penalty.    Before Judge Callaway.    McDuffie superior court.    September term, 1898.

T. E. Watson, J. T. West, and J. R. Lamar, for plaintiff.
Joseph B. & Bryan Cumming, for defendant.

COBB, J.    This was an action against a railroad company, brought to recover the penalty provided for in sections 2248 et seq. of the Civil Code, which are as follows: "§ 2248. All overseers or track-menders on the different railroads in this State shall file weekly, with the station-agents, a list of the different marks and brands of all stock killed upon their respective sections the preceding week, so as to be compelled to identify, in their weekly report, on what part of their section such stock was, or may have been killed, by some designated place on said section. § 2249. Said list shall be placed in a conspicuous place in the office of the said station-agent, for the inspection of all·persons concerned. § 2250. Upon failure of any overseer or track-mender to comply with the provisions of section 2248, he shall be liable to pay the owners of said stock double the value of all stock killed on his particular section, and not reported during such failure; the same to be recovered in the same manner as· now provided by law for the collection of claims for stock killed on railroads in this State. § 2251. In case the overseer or track-mender is insolvent, then and in that case the railroad company in whose employ they are shall be liable to pay according to the provisions of section 2250; Provided, that in all cases where the penalty shall be collected from the overseer or track-mender, the liability of the railroad company in whose employment they may be shall thenceforth cease." The single question raised in the. main bill of exceptions is, whether the word "marks," as used in the section first above quoted, refers to other than artificial marks. In determining this question it is only necessary to consider what is the usual and ordinary meaning to be given to the word "marks" when used in connection with "brands" and other words indicating devices upon stock, placed there for purposes of identification. When we speak of the "marks and brands" used by an owner of stock to designate his property and distinguish it

from property of like character belonging to others, every one understands the expression to include only those devices placed upon stock by artificial means. The word "brand" indicates some figure or device burned upon the animal by a hot iron, and the word "mark" indicates generally some change made in some part of the animal by a knife or other means, such as boring or slitting the ear. The "brand" is more commonly used upon some animals as a means of identification, such as horses, mules, and the like; while others are generally identified by "marks" made by knife-cuts in the ear, such as cattle, hogs, and the like. An examination of the different statutes which have been of force in this State relating to the subject of marks and brands upon stock demonstrates with almost absolute certainty that these words when used together have the meaning above given, that is, devices upon animals placed there by a hot iron, or some change made by a knife-cut or otherwise. In 1773 an act was passed to "prevent the stealing of horses and neat cattle, and unlawfully branding, marking, killing, or driving the same;" and it was therein provided that upon the sale or exchange of any horses or cattle the person selling or exchanging the same, if required by the purchaser, should "be avouched and tolled, and a certificate thereof obtained from the toll-master," who was required to enter in a book to be kept for that purpose, among other things, "the burnt mark or other notable flesh-mark" of the animals sold or exchanged. It was also provided in the act that any person convicted "of branding, marking, or disfiguring the brand, or altering the mark," of any live stock should be punished in the manner therein prescribed. Another provision of the act was, that any person who should order or direct his slave to "mark or brand any horses or neat cattle," when such person was not present at the time that the slave did the marking or branding, should be punished in the manner therein provided for. Prince's Dig. 146; Colonial Acts 1755–1774, p. 313; Watkins' Dig. 184; Marbury & Crawford's Dig. 52.

In 1792 an act was passed authorizing persons "to record their marks and brands" in the clerk's office of the superior court of the county of their residence; and it was therein pro-

vided that "if any person or persons shall neglect to record the same, then and in that case, whenever any property shall or may happen to be in dispute between the party so recording his marks and brands, and any other person not having recorded as aforesaid, both having one and the same marks or brands, the property being found in the possession of the person complying with this act, the party so claiming any such property in dispute as aforesaid shall not be allowed to take the same out of the hands of the person found in possession, without such claimant can prove, by disinterested testimony, such property so in dispute, and that the same is his property." It appears from a proviso in this same act that prior to the passage of the act persons were allowed to record "their brands and marks" in the office of the secretary of State. Prince's Dig. 149; Cobb's Dig. 17; Watkins' Dig. 456. In an act passed in 1801, amending the estray laws of the State, it was provided that the taker-up of an estray must carry the same before a justice of the peace, whose duty it should be "to take down in writing a particular description of the marks, natural and artificial, brands, stature, age, and color of such estray." Clayton's Dig. 6; Pol. Code, §1743. The following provisions relating to "marks and brands" are contained in the Political Code: "§1757. All persons having marks and brands on cattle, or other property in this State, shall have them recorded by the ordinary of the county where the owner resides, or, if a non-resident, where the property uses, in a book kept by him for that purpose. §1758. If property shall be in dispute between one whose marks and brands are recorded, and one whose are not, both having the same mark and brand, and such property is found in possession of him whose marks and brands are recorded, the party claiming can not get possession of the same, but must sue, and prove property and damage. §1759. When two or more persons have the same marks and brands, and both are recorded, the *prima facie* right is with the older record. §1760. Marking and branding shall not take place except by or under the supervision of some competent person, on pain of forfeiting fifty dollars for each violation, to be recovered at the suit of the informer, who shall have one half the recovery; the

other half goes to the educational fund.  §1761.  Marks and brands once recorded shall not be changed, so as to be of any avail to the owner, without leave is first granted by the ordinary, and a minute made thereof."

Section 165 of the Penal Code, the provisions of which in almost the same language are found in Cobb's Digest, 792, declares that: "If any person shall mark and brand, or mark or brand, any animal before mentioned, or alter or change the mark or brand of any such animal, being the property of another, with an intention to claim or appropriate the same to his own use, or to prevent identification by the true owner thereof, he shall suffer the same punishment as is inflicted for the theft of said animal."  It seems perfectly clear that much if not all of the language used in connection with "marks and brands" in the laws above referred to could have no application except to artificial marks.  Such language as this:  "Recording marks and brands," "altering" and "disfiguring" marks and brands, "the same marks and brands" used by different persons, slaves not permitted to "mark and brand" except in the presence of a white man, "marking and branding shall not take place," can not apply except to marks made by artificial means.  The fact that in one act (that of 1801) the words "natural or artificial" follow the word "marks" is almost conclusive of the legislative intention in other acts that marks, when not accompanied with this explanatory language, should not embrace other than those marks made by artificial means.  Giving to the words in the statute under consideration in the present case this meaning, which was the usual meaning of the words at the time of the passage of the acts above referred to, and is also at the present time, the statute does not include marks upon stock other than those made by artificial means; and this interpretation should be given the words whether the rules applicable to penal or remedial statutes be applied.  The legislative intention is clear.  The words "marks and brands" are to be taken in their ordinary sense, and be given their usual acceptation; and when this is done they can not be held to include other than those made by artificial means.

*Judgment on main bill of exceptions affirmed; cross-bill dismissed.  All the Justices concurring.*